IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

BOBBY HALFORD, on behalf of himself
and others similarly situated                                                    PLAINTIFF

VERSUS                                        CIVIL ACTION NO. 2:09cv110KS-MTP

NO HOPE LOGGING, INC. and
MICHAEL HEATH SISTRUNK, Individually                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This cause is before the Court on the Motion for Summary Judgment [Doc. # 25] (April 14, 2010) and memorandum in support [Doc. # 28] (April 23, 2010) filed by Defendants No Hope Logging, Inc., and Michael Heath Sistrunk and refiled with redacted exhibits [Doc. # 37] (July 9, 2010). This Motion is opposed by Plaintiff Bobby Halford [Docs. # 32] (June 9, 2010). The court, having reviewed the motion, the responses, the pleadings and exhibits on file and being otherwise fully advised in the premises, finds as follows:

## I. BACKGROUND

Halford is a former employee of No Hope Logging, Inc. and brings claims against No Hope Logging and one of its owners, Michael Heath Sistrunk ("Heath"), under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et.seq.*, for failure to pay overtime. Defendants claim that they are exempt from the overtime pay requirements under the forestry exemption, 29 U.S.C. § 213(b)(28), because No Hope Logging employed no more than eight employees, including

1

Heath, at any given time. In response, Halford asserts that the number of employees is disputed and not supported by the evidence. Halford also argues that the Court should count employees of No Hope Trucking, Inc., which is a separate company owned and operated by Heath and his wife, Amanda Sistrunk ("Amanda") when determining whether the forestry exemption for employers with less than eight employees applies.[1]

Both No Hope Logging, Inc. and No Hope Trucking, Inc. are Mississippi corporations formed in December of 2004 owned in equal parts by Heath and Amanda. The logging company is engaged in the business of cutting and harvesting timber under a contract with Weyerhaeuser. Defs.' Rebuttal 5 [Doc. # 36]. It uses two crews, each outfitted with a skidder, a cutter, a loader, and three employees to operate each of the three pieces of equipment. Halford worked sporadically as a crew member between May 5, 2008, and April 30, 2009. *See* Defs' Rebuttal, Ex. 4, Amanda's Dep. at 29 [Doc. # 36-2]. In addition to these six employees, No Hope Logging employs a mechanic and Heath as the foreman, bringing the total to eight employees. Because of a high rate of turnover, the logging company employed 20 employees total over the course of 2008, and 14 employees total between January 1, 2009 and September 1, 2009, but Defendants claim they never had more than eight employees working for the logging company at any given time. *See* Defs.' Mem. Supp. Summ. J. 2 [Doc. # 28]; Defs' Rebuttal, Ex. 4, Amanda's Dep. at 11-12, 26, 27-28, 33-34 [Doc. # 36-2 & 36-3]. In her deposition, Amanda did note two weeks in all of 2008 and 2009 when the payroll listed nine employees for the pay period or workweek.

---

[1]Since Heath and Amanda Sistrunk share the same last name, the Court will use their first names throughout its opinion for clarity. While Amanda is not a party in the case, her deposition is the primary evidence presented by both parties in support of their positions. No Hope Trucking is not named as a defendant either.

Amanda's Dep. at 34-35.  She explained, "if there was for some reason nine employees on here, it was because one quit during that pay period so we had to replace him with another employee, but that they weren't employed on the same day." *Id.* at 34.  Again, the nine employees in one pay period would include Heath, the co-owner. *Id.*

The crew members work from 6:30 a.m. to 4:30 p.m. with a thirty minute lunch break.  They are paid $130.00 or $135.00 per work day.  If the weather does not permit harvesting that day and the crew member shows up to work, he is paid $30.00 for that day and is sent home. *Id.* at 30, 55.  If the crew members work beyond these set hours, they are paid by the hour. *Id.* at 55.  Halford worked beyond his regularly scheduled hours once for two hours the week of November 20, 2008, and was paid $15.00 per hour for this extra time above and beyond his regularly scheduled hours.  The employees were paid weekly, and each pay period included one workweek.

Under its contract with Weyerhaeuser, the logging company must use Harvest Haul, an independently owned and operated business, to transport the harvested logs. *See* Amanda's Dep. at 13.  Weyerhaeuser does not require that No Hope Logging use No Hope Trucking but they can and do use them because they produce more wood than Harvest has capacity to carry. *See id.* at 15-16.  If Harvest Haul transports the timber, Weyerhaeuser pays No Hope Logging a per-ton rate, minus the per-ton rate that Harvest Haul gets for its services.  If No Hope Trucking hauls the timber instead of Harvest Haul, Weyerhaeuser pays No Hope Logging the full per-ton rate without subtracting out the amount that will be paid to the hauler. *Id.* at 23-24.  In other words, when No Hope Logging and No Hope Trucking harvest and transport a particular load, Weyerhaeuser only sends one check payable to No Hope Logging since the businesses are at the same address. *Id.* at 43.

The trucking company is engaged in the business of transportation of forest products either in log form or topsoil. The trucking company had two to four trucks during the relevant time period and employed a driver per truck. *Id.* at 22. These drivers do not participate in the harvesting of logs. The trucking company is under a separate annual service contract with Weyerhaeuser, and must be available to be dispatched wherever it is needed, regardless of what company is harvesting the timber. *Id.* at 40-42. Amanda testified that "if a truck dispatcher calls and said we need your truck to go to another logging site and pick up logs, you have to go and do it. You can't say, no, I'm only going to haul off this job. You have to go where they tell you to go." Amanda further testified that "if [Weyerhaeuser] tell us that we have to go haul off of another logging job, then our trucks have to go, they don't have a choice. So then in turn, we have asked for [Weyerhaeuser] to pay us in separate checks for that, they don't. That's why everything is on one statement." *Id.* at 41. When No Hope Trucking hauls timber or other products for companies other than Weyerhaeuser, that entity pays No Hope Trucking directly, which provides the trucking company a means of making a profit. *Id.* at 48-49. No Hope Logging does not pay No Hope Trucking based on the number of loads it carried on Weyerhaeuser jobs. Instead, Amanda transfers money weekly from No Hope Logging to No Hope Trucking in an amount sufficient to cover the bills and other expenses incurred by the trucking company, such as payroll, truck repairs, diesel fuel, and loan repayment, if the bills cannot be covered by money already in the Logging Company account.[2] *Id.* at 18-19, 48-49.

---

[2]The following example was discussed at Amanda's deposition:

Q. When Givens Logging pays No Hope Trucking, I assume that there would be a means for gaining a profit through that business arrangement; correct?
A. Correct.

## II. STANDARD OF REVIEW

Summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2) (2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). To support a motion for summary judgment, "the moving party ... [has] the burden of showing the absence of a genuine issue as to any material fact." *Burleson v. Tex. Dept. of Criminal Justice,* 393 F.3d 577, 589 (5th Cir 2004). Material facts are those that "could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (internal citations omitted). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" on that issue. *Anderson v.*

---

| | |
|---|---|
| Q. | So where does that profit for No Hope Trucking go? |
| A. | To pay bills. |
| Q. | So if Givens Logging pays No Hope Trucking and you have a surplus of $500 just to say– |
| A. | Okay. |
| Q. | – that $500 would sit in No Hope Trucking's bank account and help pay the bills for the next week? |
| A. | That's correct. |
| Q. | So that a little less money from No Hope Logging would be transferred to No Hope Trucking? |
| A. | That's correct. |
| Q. | Has there ever been an instance at the end of the year that there was still money left in that account for No Hope Trucking? |
| A. | Yes. |
| Q | What do you do with it then? |
| A. | Roll it to the next year and start paying bills with it. |

*Id.* at 48:17-49:14.

5

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the court views all evidence "in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in its favor." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 331 (5th Cir. 2007). If the movant satisfies its initial burden, then the burden shifts back to the non-moving party to produce evidence indicating that a genuine issue of material fact exists for each essential element of its case. *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 246-47 (5th Cir. 2003). The non-movant is not entitled to merely rest on his pleadings, but must set forth "specific facts showing there is a genuine issue for trial." *DirecTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). Once a properly supported motion for summary judgment is presented, the non-moving party must rebut with "significant probative evidence." *In Re Mun. Bond Reporting Antitrust Lit.*, 672 F.2d 436, 440 (5th Cir. 1982). If the non-movant responds and still "no reasonable juror could find for the non-movant, summary judgment will be granted." *Caboni v. General Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

While generally "[t]he burden to discover a genuine issue of fact is not on [the] court," *Topalian v. Ehrman,* 954 F.2d 1125, 1137 (5th Cir. 1992), "Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention– the court must consider both before granting a summary judgment." *John v. Louisiana (Bd. of Tr. for State Coll. & Univs., et. al.),* 757 F.2d 698, 712 (5th Cir. 1985) (quoting *Keiser v. Coliseum Prop., Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

# III. LAW AND APPLICATION

Halford clearly worked hours in excess of 40 hours per week. The crew members worked daily from 6:30 a.m. to 4:30 p.m. with thirty minutes for lunch. Halford's payroll history indicates that he worked five or six days a week at least seven weeks of his total nineteen weeks with No Hope Logging. *See* Pl.'s Mem. Opp. Mot., Ex. 4 [Doc. # 35]. The only issue then is whether No Hope Logging was exempt from the requirement to pay time and a half for any time worked over forty hours per week under the forestry exemption, 29 U.S.C. § 213(b)(28).

### A. Whether No Hope Logging Qualifies for the Forestry Exemption

Whether No Hope Logging was exempt from the overtime payment requirements of § 207 is a matter of statutory construction.[3] Section 207 does not apply to:

> any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight.

29 U.S.C. § 213(b)(28). Exemptions from the overtime provisions should be narrowly construed against the employer and the burden of proof lies with the employer. *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 584 (5th Cir. 2006).

The Code of Federal Regulations instructs that "the determination of the number of employees employed in the named operations is to be made on an occupational and a workweek

---

[3]Under § 207, an employer must pay one and a half times the employee's regular rate for any time worked over forty hours per week. 29 U.S.C. § 207(a)(1).

basis." 29 C.F.R. §788.13 (2005). "The exemption will not be defeated, however, if one or more of the eight employees so engaged is replaced during the workweek, for example, by reason of illness." *Id.* During the relevant time period, No Hope Logging employed eight or fewer employees at any given time. Amanda clearly explained in her deposition that No Hope Logging had two crews of three employees each, a mechanic, and Heath working as foreman. She further explained that the two weeks listing nine employees represented weeks during which an employee was replaced mid-week. It is immaterial that the annual payroll records indicate that No Hope Logging employed a total of 20 employees in 2008 and 14 for 2009 because the proper inquiry is the number of employees during each workweek.

The Court need not decide whether an owner who also works as a crew member in exempt operations should be included in the employee count for purposes of determining whether the exemption applies or whether the mechanic was involved in exempt operations.[4] Even including Heath and the mechanic in the employee count, the number of total employees did not exceed eight per workweek, except during the two weeks involving employee replacements. Since Halford has not presented any probative evidence disputing these facts, No Hope Logging, considered alone, would qualify for the forestry exemption, 29 U.S.C. § 213(b)(28).

---

[4]The Court does, however, recognize that at least one district court has interpreted the exemption to not include owners as employees even when they participate in the activities contemplated by the statute like cutting and transporting timber. *See Beard v. Langham*, 649 F.Supp. 2d 1332, 1338 (S.D. Ala. 2009) ("clearly the act does not contemplate employers being classified as 'employees'").

## B. Whether No Hope Trucking Is an "Alter Ego" of No Hope Logging Such That They Constitute A Single Employer

Finally, Halford argues that No Hope Trucking's three employees should be considered in the total number of employees for No Hope Logging because the trucking operation is merely an alter ego of No Hope Logging and not an independently owned and operated business. The Regulations state that if an employer "employs six employees in [felling timber and preparing logs] and three other employees in transportation work . . . the exemption could not apply." 29 C.F.R. § 788.13. The Regulations further advise:

> In many cases an employer who operates a sawmill or concentration yard will be supplied with logs or other forestry products by several crews of persons who are engaged in the named operations. Frequently some or all of such crews, separately considered, do not employ more than eight persons but the total number of such employees is in excess of eight. Whether the exemption will apply to the members of the individual crews which do not exceed eight will depend on whether they are employees of the sawmill or concentration yard to which the logs or other forestry products are delivered or whether each such crew is a truly independently owned and operated business. If the number of employees in such a truly independently owned and operated business does not exceed eight, the exemption will apply. **On the other hand, the Secretary and the Administrator will assume that the courts will be reluctant to approve as bona fide a plan by which an employer of a large number of woods employees splits his employees into several allegedly "independent businesses" in order to take advantage of the exemption.**

29 C.F.R. § 788.15 (2005) (emphasis added). In other words, an employer cannot evade the requirements of the FLSA by forming an alter ego company. *See* 48 Am. Jur. 2d, Labor and Labor Relations, § 716 (2010).

The plaintiff has the burden of proving that a company is an alter ego created with the purpose of evading labor laws. *See S. Cal. Painters & Allied Trades, Dist. Council No. 36 v.*

9

*Rodin & Co.*, 558 F.3d 1028, 1032 (9th Cir. 2009). The Fifth Circuit set forth the appropriate test to determine if two companies are alter egos:

> Whether two companies are alter egos is a question of fact answered through two inquiries. *See Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942). First, the Board must determine "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership. *Carpenters Local Union No, 1846, United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 507 (5th Cir. 1983). Second, it must gauge whether there was an unlawful motive behind the creation of the new business entity, determining whether there was a "disguised continuance" or "attempt to avoid the obligations of [an existing] collective bargaining agreement through a sham transaction or technical change in operations." *Id.*

*J. Vallery Elec., Inc. v. N.L.R.B.*, 337 F.3d 446, 451 (5th Cir. 2003).

In *Vallery*, the Fifth Circuit upheld the National Labor Relations Board's ("NLRB's") finding that an alter ego was formed to avoid the obligations of a collective bargaining agreement ("CBA"). *Id.* at 447. In this case, Vallery Electric, Inc. ("VE") was using union labor and paying union wages for commercial electrical contracting projects, but non-union labor at non-union wages for residential projects. *Id.* at 448. When a new business manager for the International Brotherhood of Electrical Workers ("IBEW") replaced the former business manager, he informed VE that any previous agreement distinguishing between commercial and residential jobs would no longer be recognized, and that VE would have to employ union labor for all its jobs. *Id.* Following this, the new business manager and Jimmy Vallery, VE's president, met three times because of VE's continued use of non-union labor in violation of the CBA. *Id.* In response, Jimmy Vallery announced his intention "to separate" from the old company, and he formed a new non-union company, "J. Vallery Electric, Inc." ("JVE"). *Id.* at 448-49. The Fifth Circuit

upheld the NLRB's determination that JVE was not a bona fide successor, but merely an alter ego formed to evade labor laws. *Id.* at 451-52. The Court found substantial evidence that JVE had the same employees, management, and services; kept the same pending and current jobs; took over the building and three of five VE work trucks without compensation; and even took over the design of VE's phone book ad. *Id.* Further, the court found proof of unlawful motive, noting that the transfers' lack of consideration demonstrated that "there was not even a pretense of an arm's length relationship between JVE, VE, and the principals of each during the formation of JVE." *Id.* at 452. More importantly, the Court noted that "the record clearly shows that Vallery openly expressed his concerns about VE's obligations to the IBEW and admitted his intention to start a new corporation specifically to avoid paying union wages." *Id.*

To the Court's knowledge, courts have rarely addressed issues of whether logging and trucking businesses are alter egos or a single employer/enterprise in the context of FLSA overtime violations and the forestry exemption. When they have, the courts have analyzed whether the haulers were employees or independent contractors of the logging company, an analysis that is similar to, yet distinct from, the first inquiry of the alter ego test. The FLSA itself provides only broad definitions of the terms "employer, " "employee," and "employ." An "employer" is defined as "any person acting directly or indirectly in the interest of an employer." 29 U.S.C. § 203(d). An "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g). The courts have determined that whether an employment relationship exists for purposes of applying the FLSA is a question of law which is determined by the economic realities. *See Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 & n.4 (5th Cir. 1981); *Shultz v. Hinojosa*, 432 F.2d 259, 264 (5th Cir.

11

1970) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947). There is not a single test or rule for determining whether an individual is an employee or an independent contractor, and instead the court must look at the totality of the circumstances. *See* 29 C.F.R. § 788.16.

The only case that the parties cite is a case from the Southern District of Alabama in which tree-toppers sued their employer for violation of the FLSA. *See Beard v. Langham*, 649 F. Supp. 2d 1332, 1334 (S.D. Ala. 2009) (granting summary judgment in favor of logging employer in overtime compensation case). In this case, the court conducted a much simpler analysis than that in *Vallery* and summarily dismissed the alter ego/one business enterprise allegation in a footnote. *See id.* at 1334 n.1. The Court did not count the tree-topper employees of Charles T. Langham d/b/a Charles Langham Logging ("CLL") together with employees of Langham Repair Shop, Inc., which was also 100% owned by Langham. *Id.* The Court reasoned that, "none of the Plaintiffs have ever worked for Langham Repair Shop, and Langham Repair Shop has never paid any of the Plaintiffs for any services rendered." *Id.* Nor did the Court count employees of a separate trucking company that Langham Logging contracted to haul its timber to the sawmill because they were held to be independent contractors instead of employees. *Id.* at 1335. The court applied the economic reality test, and considered the company's degree of control over the haulers, the company's investment in the haulers' equipment, the haulers' opportunity for profit and loss, the permanency of the relationship between the company and the haulers. *Id.* at 1339. The haulers owned their own trucks and were contracted by CLL for a week at a time. *Id.* at 1340. They could and did work for other logging companies and CLL could and did hire other haulers. *Id.* The haulers and not CLL owned, fueled, and maintained the trucks. *Id.* at 1341. The haulers could affect their own profits by negotiating better insurance costs, finding the best fuel

prices, and negotiating its rates for service. *Id.* at 1342. Based on the record, the haulers were not considered employees and summary judgment was granted in favor of CLL. *Id.* at 1343.

In contrast, the Eighth Circuit in *Tobin v. Anthony-Williams Mfg. Co.*, found that timber haulers were not independent contractors as the district court had determined, but were employees of the lumber company. 196 F.2d 547, 549 (8th Cir. 1952). In making its determination of whether an employment relationship existed, the court considered: "degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation, and skill required in the claimed independent operation." *Id.* (quoting *United States v. Silk*, 331 U.S. 704, 716 (1947)). In this case the haulers were formerly considered and paid as employees. However, the company had created a new policy in which the haulers would be paid by the load minus $2 each load that would go toward the purchase of the truck. *Id.* at 548. None of the haulers had successfully completed purchase of a truck. *Id.* at 548-49. The Court found:

> Defendant, in effect, controls their activities. They are directed where and what to cut. The amounts of their deliveries are determined by the work of defendant's loader and by the capacity of defendant's storage facilities. The haulers have no substantial investment in their trucks, and their ownership is no more than nominal. They cannot use the trucks for other than defendant's business, even on days they are not working for the defendant. Defendant does not furnish the woods workers with saws and axes, but the teams necessary are furnished and owned by defendant. The haulers have small chance of any large financial return, and do not incur losses. Admitted employees perform identical work.

*Id.* at 549-50.

Based on the economic realities in the case at hand, the haulers from No Hope Trucking cannot be considered employees of No Hope Logging. Halford has not presented any evidence that the haulers were paid by No Hope Logging, and to the contrary, the Defendants have

13

provided evidence that the two companies maintained separate employees and payrolls and that the haulers received W-2s from No Hope Trucking, Inc. The record clearly indicates that Weyerhaeuser, and not No Hope Logging, had ultimate control over which jobs the haulers worked. Further, Weyerhaeuser required No Hope Logging to use a independent company, Harvest Haul. The Defendants made clear that the trucking company was responsible for its own expenses, which were paid from its own bank account, including loan repayments, fuel, repairs, and payroll. The hauling company, unlike the haulers in *Tobin*, had independent sources for profit by virtue of its opportunities to haul for other entities. Finally, while No Hope Trucking could, in theory, continue to haul timber harvested by No Hope Logging indefinitely, the permanence of this relationship is based entirely on Weyerhaeuser's discretion to renew the annual contracts with each company. Ultimately, Weyerhaeuser, and not No Hope Logging, decides whether No Hope Trucking can continue hauling loads harvested by No Hope Logging under Weyerhaeuser's contracts. The haulers' economic circumstances in this case resemble the haulers' circumstances in *Beard* in almost every respect. The only substantial difference between the circumstances in *Beard* and the case at hand is the ownership of the two businesses. While two separate people owned the hauling and logging companies in *Beard*, the Sistrunks own both companies in the case at hand. However, the court does not find this determinative in its employment analysis. It may be that this fact would go to the degree of control that No Hope Logging had over the haulers; however, the court finds that the Wayerhaeuser contracts effectively limit that control as discussed above. Therefore, the haulers employed by No Hope Trucking would more succinctly be viewed as independent contractors, and not employees, of No Hope Logging, and the three haulers would not be counted towards the number of employees for

14

purposes of the forestry exemption.

Turning now to the alter ego argument, the Court finds that Halford has failed to present significant probative evidence sufficient to create a genuine issue of material fact. The first inquiry asks whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership. Defendants have presented a significant amount of evidence through the deposition testimony of Amanda that the logging and trucking companies have separate operations, employees, payroll, bank accounts, and Weyerhaeuser contracts. Halford, in reply, emphasizes the common ownership between the two companies, and the weekly transfers from No Hope Logging, who received all payments from Weyerhaeuser, to No Hope Trucking to cover bills and expenses. The Court does not find that the common ownership and money transfers are significant enough to create a genuine issue of material fact such that a reasonable juror could find that No Hope Trucking was an alter ego of No Hope Logging.

Even if the common ownership and money transfers were significant enough to create a jury issue, Plaintiff has failed to produce any evidence that the logging company was created with the purpose of evading the labor laws in general or the FLSA in particular. Amanda testified that the two companies were created at the same time, and that they were separately formed for purposes of law suits and liability. *See* Amanda Dep. at 28. It is a rather unremarkable proposition in that both harvesting and hauling timber would be dangerous operations that would involve risks of accidents or injuries. Perhaps the outcome in this case would be different if the logging company restructured its business as it added employees by breaking crews into different business entities. This is the type of improper behavior specifically discussed in the Federal

15

Register– "a plan by which an employer of a large number of woods employees splits its employees into several allegedly 'independent businesses' in order to take advantage of the exemption." However, No Hope Trucking was not formed through a restructuring, as contemplated by the Federal Register, or as attempted in *Vallery* when Mr. Vallery formed the new electrical contracting company to do the same jobs for the same people using the same facilities and equipment.[5] Unlike in *Vallery*, where the Court found that "there was not even a pretense of an arm's length relationship" between the companies, No Hope Trucking and No Hope Logging have consistently kept the two companies' assets and obligations separate since forming the companies in 2004. That No Hope Logging was cognizant of and consciously stayed in compliance with a FLSA exemption is simply not equivalent to the company taking actions in order to evade its requirements.

The only evidentiary support for Halford's alter ego argument is the out of time deposition of Amanda. Amanda avers that, contrary to Halford's theory and consistent with their actual practices, that No Hope Trucking is operated independently of No Hope Logging. The discovery deadline has passed and yet Halford has not presented any affidavits or evidence in support of his reply with the exception of an unsigned affidavit from Halford that relates solely to the number of hours he worked while at No Hope Logging and answers to Halford's Request for Admissions that do not inquire about No hope Trucking or the employment relationship between the haulers of No Hope Trucking and No Hope Logging. As such, Halford has not presented

---

[5]In fact, No Hope Logging actually added a third crew in January 2010, for a total of 10 employees, and now pays hourly wages and overtime since they are no longer exempt from the requirements under the forestry exemption. *See* Amanda Dep. at 28.

evidence of specific facts demonstrating an issue for trial such that a reasonable juror could find for him.

## IV. CONCLUSION

Defendants have clearly shown that No Hope Logging, Inc., when considered alone, qualifies for the FLSA forestry exemption. Plaintiff has not presented any evidence that he was employed by No Hope Trucking, or alternatively, that the haulers were employees of No Hope Logging. To the contrary, No Hope Logging has presented evidence that No Hope Trucking, though sharing common ownership with No Hope Logging, functioned as an independent contractor. Additionally, Plaintiff has not presented any evidence that the Sistunks's motivation for forming No Hope Trucking was to evade the requirements of the FLSA, and therefore has not shown a genuine issue of material fact regarding his alter ego allegations. Therefore, the motion for summary judgment should be **granted**. A separate judgment shall follow.

SO ORDERED AND ADJUDGED this the 23rd day of July, 2010.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE